**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

**CAMDEN VICINAGE**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>        v.<br><br>JAMES E. CARSON,<br><br>    Defendant. | Crim. No. 10-607 (RMB)<br><br>**OPINION** |

<u>Appearances</u>:

Matthew T. Smith, Esq.
Office of the United States Attorney
District of New Jersey
Camden Federal Building & Courthouse
401 Market Street, 4th Floor
Camden, New Jersey 08101

       Attorney for the Government

Maggie F. Moy, Esq.
Office of the Federal Public Defender
800-840 Cooper Street, Suite 300
Camden, New Jersey 08102

       Attorney for the Defendant

**BUMB**, UNITED STATES DISTRICT JUDGE:

Before the Court is a motion to suppress evidence by the

defendant James E. Carson ("Defendant"). Defendant argues that

1

police officers stopped and frisked him in violation of his Fourth Amendment rights, and the firearm they seized from him during this encounter was therefore obtained unlawfully and must be suppressed. After conducting an evidentiary hearing on this matter on June 20, 2011, the Court denied Defendant's motion. [Dkt. Ent. 23.] Subsequently, the government produced evidence, which the Court determined it must disclose to Defendant pursuant to Giglio v. United States, 405 U.S. 150 (1972).[1] The Court therefore reopened Defendant's motion to suppress, permitted defense counsel time to review the relevant evidence, and subsequently conducted two additional evidentiary hearings on August 19, 2011, and March 8, 2012. At Defendant's request, the parties then submitted supplemental briefing. The matter is now ripe for adjudication. Having considered the parties' arguments and all the evidence, the Court again denies Defendant's motion.

## I. BACKGROUND

Defendant was arrested in Camden, New Jersey, on April 11, 2010,

---

[1] The Court determined that certain documents constituted Giglio material – including Defense Exhibit 5 (a New Jersey State Police "Supervisory Review of Mobile Video Recorder Contacts" report, dated September 10, 2003) and Defense Exhibit 6 (a New Jersey State Police Performance Notice, dated December 9, 2003) – since they reflected that State Trooper Kurt Kennedy, one of the arresting officers in this case, had received a performance notice for filing an inaccurate report. According to Defense Exhibit 5, Kennedy filed a police report stating that he had observed suspects with bags of clothes that had price tags on them, but when he contacted his supervisor at the time of the search, he indicated that he had not observed such tags on the clothing. The police investigation into Kennedy also called into question whether he had obtained consent to search, since his investigation report did not mention such consent. (Def. Ex. 5.)

for unlawful possession of a weapon and related charges. A grand jury indicted him on September 15, 2010, with (1) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and (2) possession of a shotgun with a barrel length of less than 18 inches, which is not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. Defendant pled not guilty on September 30, 2010. He filed an omnibus motion on May 19, 2011, which included the pending motion to suppress.

## II. LEGAL STANDARD

Generally, a defendant who seeks to suppress evidence carries the burden of proof. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995), cert. den'd, 518 U.S. 1007 (1996) (citing United States v. Acosta, 965 F.2d 1248, 1257 n. 9 (3d Cir. 1992), in turn citing Rakas v. Illinois, 439 U.S. 128, 130 n. 1 (1978)); United States v. Leake, Crim. No. 07-655, 2009 WL 482372, *2 (D.N.J. Feb. 25, 2009), aff'd, 396 Fed. Appx. 898 (3d Cir. 2010), cert. den'd, 131 S.Ct. 1541 (2011). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." Johnson, 63 F.3d at 245 (citation omitted); Leake, 2009 WL 482372 at *2. Here, the parties agree that Defendant was stopped and frisked without a warrant. Thus, the government must show by a preponderance of the evidence that this conduct did not

exceed the bounds of the Fourth Amendment. <u>United States v. Matlock</u>, 415 U.S. 164, 178 n. 14 (1974); <u>Leake</u>, 2009 WL 482372 at *2.

The Fourth Amendment protects individuals from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." <u>United States v. Lewis</u>, -- F.3d --, 2012 WL 556065, *4 (3d Cir. 2012) (quoting <u>United States v. Robertson</u>, 305 F.3d 164, 167 (3d Cir. 2002), <u>cert. den'd</u>, 538 U.S. 1043 (2003)) (internal quotations omitted). However, a "well-established exception to the Fourth Amendment's warrant requirement permits an officer to conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." <u>Id.</u> (quoting <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000), in turn citing <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)) (internal quotations omitted). If the officer has reasonable suspicion that a suspect is armed and dangerous, he may also conduct a protective frisk of the suspect's outer clothing for weapons. <u>Terry</u>, 392 U.S. at 27.

To determine whether reasonable suspicion existed to justify a search and seizure, courts must consider the "totality of the circumstances – the whole picture." <u>Robertson</u>, 305 F.3d at 167 (quoting <u>United States v. Sokolow</u>, 490 U.S. 1, 8 (1989)) (internal quotations omitted). In making this assessment, courts "'give considerable deference to police officers' determinations of

reasonable suspicion.'" United States v. Lopez, 441 Fed. Appx. 910,
913 (3d Cir. 2011), cert. den'd, -- S.Ct. --, 2012 WL 645892 (2012)
(quoting United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006));
see also United States v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006)
("[W]e must allow 'officers to draw on their own experience and
specialized training to make inferences from and deductions about the
cumulative information available to them that might well elude an
untrained person.'") (quoting United States v. Arzivu, 534 U.S. 266,
273 (2002)).  Nevertheless, the detaining officer must have a
"particularized and objective basis for suspecting the particular
person stopped of criminal activity." Goodrich, 450 F.3d at 559
(quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).
Importantly, "[r]easonable suspicion is 'a less demanding standard
than probable cause and requires a showing considerably less than
preponderance of the evidence.'" United States v. Valentine, 232
F.3d 350, 353 (3d Cir. 2000), cert. den'd, 532 U.S. 1014 (2001)
(quoting Wardlow, 528 U.S. 119).

### III. DISCUSSION

### A. Evidentiary Hearing on June 20, 2011

At the first evidentiary hearing, held on June 20, 2011, the
Court heard testimony from State Troopers Fausto Zapata and Kurt
Kennedy and Defendant's cousin, Jonathan Candelario.  Certain facts
are not in dispute.  On April 11, 2010, at 11:00 p.m., Troopers Zapata
and Kennedy were conducting a "sneak and peek" operation in Camden,

in response to complaints of drug sales and people brandishing weapons. (Hearing Transcript, June 20, 2011, 126:8-10, Dkt. Ent. 27 ("Tr.").)[1]  As part of this operation, the troopers sat in an unmarked car on Baring Street, observing Defendant and others from approximately 30 yards away.   It was dark, but the weather was clear, and there was light coming from nearby residences and street lamps. The parties agree that this is a high-crime area.   Trooper Zapata testified that a month or two prior to this arrest, he was involved in an investigation in which he retrieved weapons from two separate individuals in this neighborhood.   (Tr. 19:1-7.)

### 1. Zapata and Kennedy's Testimony

Zapata and Kennedy testified consistently as to all the relevant events leading up to Defendant's arrest.   Both troopers testified that their view of Defendant was clear and unobstructed (Tr. 21:8-10, 66:4-7) and that they observed Defendant acting in a suspicious manner, see infra.

Trooper Zapata testified that he observed "three or four black males standing halfway down the block."  (Tr. 20:12-13.)  Defendant caught his attention, because he was "looking up and down the street", walking in an unusual manner, "dragging his left leg", and "continually grabbing" the left side of his waistband.  (Tr. 20:12-20.)  Zapata explained: "normally when you walk, you bend your

---

[1] According to Trooper Zapata, in a "sneak and peek" operation, police officers investigate potential criminal activity by conducting surveillance on individuals from a location where the officers cannot be observed.  (Tr. 14:10-14.)

knees and walk in a fluid motion. He wasn't walking fluid, he was kind of dragging his left leg." (Tr. 21:1-3.) Zapata testified that based on his nine and a half years of experience and training (Tr. 12:1-7), Defendant's behavior led him to believe that he was possibly carrying a firearm. (Tr. 15:22-16:6, 25:5-12.) Zapata had made approximately 20 to 25 arrests involving firearm offenses in Camden prior to this. (Tr. 13:15-14:1.)

Trooper Kennedy corroborated Zapata's testimony, stating that he observed Defendant, who had distanced himself from the others, "looking up and down the street" as if watching for "some type of police presence." (Tr. 70:7-12.) Kennedy testified that Defendant was "manipulating the left side of his waistband" as if there were "something on his left side that normally had to be held by both of his hands to keep it up." (Tr. 65:22-66:1.) Based on his training and experience, Kennedy believed Defendant was "concealing something" on his left side. (Tr. 69:3-8.) Since Kennedy had worked for the New Jersey State Police for nine years at the time of the hearing, he had approximately eight years of experience at the time of the arrest. (Tr. 59:7-8.)

According to Trooper Zapata, after observing Defendant's suspicious behavior and concluding that he was possibly carrying a firearm, the troopers began driving toward him and the other individuals to investigate further. (Tr. 25:11-18.) Zapata testified that as the officers approached, Defendant started turning

or "blading" his body, so as to keep his left side away from them. (Tr. 26:11-15.) As he did this, Zapata noticed an outline of what appeared to be a shotgun.[2] Zapata testified that he and Kennedy exited their vehicle and stated "State Police", at which point Defendant attempted to walk into an alleyway. (Tr. 26:19-24). According to Zapata, he seized and frisked Defendant and recovered a loaded shotgun from his left side. (Tr. 27:16-23.) Specifically, Zapata testified, "I frisked [Defendant] because I wanted to make sure that what I saw was what I saw because I didn't want him to hurt me with that weapon." (Tr. 27:6-9.) According to Zapata, after handing the gun over to Kennedy he read Defendant his <u>Miranda</u> rights and continued searching the back of Defendant's pants, where he found "shotgun casings". (Tr. 27:25-28:1, 29:3-21.)

Trooper Kennedy corroborated Zapata's testimony. He stated that after observing Defendant's suspicious behavior, the officers drove south on Baring Street, stopping right in front of Carson. (Tr. 67:7-8.) According to Kennedy, while Zapata seized Defendant, he immediately ran over to the other three individuals and ordered them to get down on the ground. (Tr. 67:12-13.) Kennedy testified that

---

[2] Zapata testified as follows:

      A: [W]hile we were driving, Mr. Carson – as the vehicle came
        up, I'm assuming he saw – he saw the headlights and he
        started blading his body, I noticed – when we got
        closer, I noticed an outline of what appeared to be a
        shotgun. This was a large – like a large object going
        down his leg.
      Q: Which leg?
      A: Left leg.
(Tr. 25:25-26:7.)

he observed Zapata retrieve a shotgun from the left side of Defendant's waistband, which he then immediately handed over to Kennedy, so Zapata could arrest and handcuff Defendant. (Tr. 67:16-21.) According to Kennedy, Zapata searched Defendant after arresting and handcuffing him, while Kennedy stood by with the other three individuals and waited for back-up. (Tr. 67:20-24.)

At the evidentiary hearing, Trooper Zapata placed the shotgun inside his pants to demonstrate how Defendant had concealed it. Defense counsel argued that it was not visible beneath Zapata's slacks (Tr. 107:18-108-3; Def.'s Suppl. Br. 2), but the Court disagrees.

## 2. Candelario's Testimony

Defendant's cousin, Jonathan Candelario, testified that he was present with Defendant on Baring Street just prior to the arrest. According to Candelario, he was talking to three friends when Defendant rode up on a bicycle. (Tr. 82:1-21.) Candelario testified that he could not see any object in Defendant's pants and that Defendant was acting normally, sitting on his bicycle and talking. (Tr. 83:23-84:10.) Candelario represented that Defendant did not appear to be looking for anyone, although he also noted, "[e]verybody looks around there because of the area." (Tr. 84:8-10.) Candelario testified that he left Defendant and the others to buy cigarettes at a nearby liquor store. (Tr. 84:19-22.) Shortly thereafter, police officers stopped and searched him and then brought him back to Baring Street. (Tr. 86:18-89:19.) Candelario testified

9

that when he arrived, Defendant and his three friends were lying down on the sidewalk, and the police officers stood them up and searched them one at a time. (Tr. 89:14-23.) Notably, according to Candelario, Defendant was searched last; the police officers reportedly stood him up against a wall, patted him down, and found the gun in his pants. (Tr. 90:19-4, 97:12-15.) Candelario conceded, however, that he did not actually see Zapata and Kennedy seize Defendant. (Tr. 80:7-11.)

### 3. Oral Argument & Supplemental Briefing

After the testimony described above, the Court heard oral argument. The Court also permitted supplemental briefing at the conclusion of the three evidentiary hearings. In its supplemental brief, Defendant raised several new arguments and also reasserted arguments it had already made at the June 20th hearing, which this Court previously rejected. For the sake of clarity and completeness, the Court now considers all of these arguments, in some cases for a second time, and sets forth its conclusions below.

Defendant first argued that on two occasions, Troopers Zapata and Kennedy testified inconsistently, and therefore neither officer was particularly credible. According to Defendant, Zapata indicated that their car was parked on the sidewalk while they observed Defendant, whereas Kennedy stated that it was parked on the street. (Tr. 115:2-4.) According to the transcript, Zapata testified that his vehicle was parked "partially" on the sidewalk (Tr. 35:13-15),

and Kennedy <u>believed</u> they had parked on the street, but was not certain. (Tr. 75:3-11.) To the extent this testimony could be construed as inconsistent, the Court did not find it to be material or to impugn either trooper's credibility.

Additionally, Defendant argued that the troopers were inconsistent in their testimony regarding whether a vehicle that was fully parked on Baring Street would obstruct traffic. (Tr. 115:5-11.) According to the transcript, Zapata testified that residents could not park their vehicles fully on Baring Street without blocking traffic (Tr. 33:15-18), and Kennedy stated that he did not <u>believe</u> a vehicle fully parked on the street would block traffic but, again, was not certain. (Tr. 75:12-17.) The Court concluded that this testimony did not call into question either trooper's credibility and had little bearing, if any, on the relevant facts adduced at the hearing.

Defendant also argued that Zapata's testimony that he first found the shotgun and then the shotgun shells was inconsistent with prior testimony he had given at Defendant's parole hearing on May 13, 2010. (Def.'s Suppl. Br. 3; Tr. 113:2-6.) On cross-examination, Zapata acknowledged that at the May 13th hearing, he testified as follows:

> "Once I reached on the right side, I felt shotgun shells and went to – it was in his rear right pocket, shotgun shells. And then I went to the left side where he kept blading, that's when I felt the shotgun was down his leg."

11

(Tr. 46:2-6.)  Defendant argued that this represents a material

discrepancy in Zapata's chronology of events, since it indicates that

Zapata searched Defendant's rear right pocket <u>first</u>, found the

shells, and <u>then</u> found the gun on Defendant's left side.   According

to Defendant, this showed that Zapata did <u>not</u> see the outline of the

gun prior to the frisk, because otherwise he would have reached for

it immediately.  (Tr. 113:2-20.)

    The Court disagreed with this interpretation of Zapata's prior

testimony.   Defendant took these two sentences out of context.

Indeed, when Defendant sought to move the above portion (from page

ten) of the May 13th transcript into evidence, the government moved

under the rule of completeness to admit the entire transcript.   (Tr.

56:24-57:8.)   The Court agreed with the government, noting that the

rest of Zapata's May 13th testimony clarified that Zapata found the

shotgun first and then the shells:

> THE COURT:  . . .  So what I would suggest is the parties
> should look – and the reason I mentioned page 11 [of the
> transcript from the May 13th hearing] is because page 11
> . . . it seems to me is a continuation of the answer where
> the officer said, "At that time, I took out the shotgun,
> placed him under arrest and searched him, and that's when
> we found the remaining shotgun rounds," which arguably is
> somewhat different from page ten.
> So, [defense counsel], should it not all come in?

(Tr. 57:12-18.)[3]  Rather than admit the complete transcript,

---

[3] While the Court did not rely on this testimony, which is not in
evidence, it notes, for the sake of completeness, that the relevant
portion of pages ten and eleven of Zapata's May 13th testimony reads
as follows:
>        A: We decided to – to approach Mr. Carson.  When we
>           approached Mr. Carson, the closer we got – uh – I

Defendant withdrew his motion to admit any portion of it, deciding instead to let Zapata's testimony at the June 20th hearing stand on its own. (Tr. 57:25-58:3.) The government inexplicably failed to examine Zapata on his May 13th testimony. Nevertheless, the Court gave little weight to Defendant's characterization of it. Read in isolation, these two sentences did not comport with Zapata's testimony at the June 20th hearing - which the Court found credible - in which Zapata stated clearly and in detail that after observing the outline of the shotgun in Defendant's pants, he frisked Defendant and immediately secured the gun.[4] Moreover, even if Zapata's prior

---

observed an outline of what appeared to be a shotgun. So, we - we pulled - pulled next to Mr. Carson, grabbed Mr. Carson, pulled his hands. He kept blading himself, blading that side, the left side away from me. I started patting him down, felt a shotgun -

Q: So, the left side he was -

A: The left side. He was blading away. Usually, a pat-down - we usually do a quicker pat-down, then people won't move unless they happen to have something, to start blading the body, trying to keep it away from you so you could miss it.

Q: Okay.

A: Um - once I reach - uh - on the right side, I felt shotgun shells and went to - it was in his rear right pocket, shotgun shells. And then I went to the left side where he kept blading. That's when I felt the shotgun was down his leg.

Q: Okay.

A: At that time, I took out - took out the shotgun, placed him under arrest, and searched him and that's when we found the remaining shotgun rounds.

(Transcript from May 13, 2010, hearing 10:8-11:4.)

[4] Zapata testified at the June 20th hearing as follows:

A: I was able to grab Mr. Carson before he got into the alleyway, . . . I frisked him because I wanted to make sure that what I saw was what I saw because I didn't want him to hurt me with that weapon. When I went to the left side, I felt a shotgun, what appeared to be

13

testimony could be construed to suggest that Zapata <u>felt</u> the shotgun shells in Defendant's right rear pocket just before finding the gun, this fact has little significance, given the relatively brief nature of such a pat-down.  Indeed, the record is unclear as to how close in time Zapata frisked the left and right sides of Defendant's body, or whether they occurred virtually simultaneously.  The Court notes its reluctance to second-guess a police officer's judgment on how best to perform a <u>Terry</u> frisk, particularly since there is no evidence that Zapata deviated from the standard pat-down procedure in this case.

Additionally, the Court rejects Defendant's argument, presented for the first time in his supplemental brief, that because he turned or "bladed" his left side away from the troopers, Zapata's testimony

---

                a shotgun, a firearm.  I felt a handle, then I went down and felt the rest of the weapon.

                \*     \*     \*

A:   . . . I retrieved [the shotgun] from his person. . . I handed it over to Trooper Kennedy, which he made it safe.

                \*     \*     \*

Q: [W]hat did you do after you removed the firearm and handed it to Trooper Kennedy?
A: I read Mr. Carson his [<u>Miranda</u>] rights and continued searching the back of his pants.

                \*     \*     \*

A: I found additional shotgun casings, loaded shotgun casings.
Q: And do you recall how many you found?
A: I found six in total, that's including the one that was inside the barrel.
Q: Because the firearm was loaded?
A: Yes, the firearm was loaded.
Q: So that's one and then –
A: Five additional.

(Tr. 27:4-11, 27:20-21, 27:25, 29:3-21.)

that he could see the outline of the gun was not credible. (Def.'s Suppl. Br. 4.) Defendant has cited no evidence in the record to support this contention. Indeed, common sense and experience suggest the opposite – that as a person turns to the side, the profile of the gun would become visible. The Court further notes that Defendant's act of turning away from the officers contributed to a finding of reasonable suspicion. Zapata testified that when a person "blades" his body in this manner, it signals that the individual is attempting to conceal something. (Tr. 26:13-15.)

Finally, Defendant contends that the troopers' true motivation in seizing Defendant was to make a narcotics arrest, as evidenced by the fact that Candelario was detained and brought back to Baring Street. (Def.'s Suppl. Br. 4.) The Supreme Court's holding in <u>Whren v. United States</u> forecloses this argument, however. 517 U.S. 806, 813 (1996) (where police had reason to believe traffic violation occurred, their actual motive in conducting traffic stop – such as investigating narcotics activity – was irrelevant). A law enforcement officer's subjective intentions play "no role" in the ordinary Fourth Amendment analysis. <u>Id.</u>; <u>United States v. Goodrich</u>, 450 F.3d 552, 563 n.10 (3d Cir. 2006); <u>United States v. Lewis</u>, -- F.3d --, 2012 WL 556065, *4 (3d Cir. Feb. 22, 2012). Rather, the Court considers only the <u>objective</u> basis for the stop: "whether a reasonable, trained officer standing in the seizing officer's shoes could articulate specific reasons justifying the seized individual's

detention." Christopher v. Nestlerode, 240 Fed. Appx. 481, 487 (3d Cir. 2007) (quoting Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003)). Trooper Zapata's personal motivation therefore has no bearing on the propriety of the Terry stop. So long as Zapata had reasonable suspicion to believe Defendant was engaging in criminal activity prior to the seizure, it is irrelevant that he may have expected to find illegal narcotics in Defendant's possession. See Lewis, 2012 WL 556065 at *4 (acknowledging that while "pretextual traffic stops supported by reasonable suspicion do not run afoul of the Fourth Amendment . . . ex post facto justifications are impermissible"). To the extent Defendant raises this argument in an attempt to impugn Zapata's credibility by suggesting that he fabricated the reasons for the seizure after the fact, the Court finds such an assertion unsupported by the record. See infra.

## 4. Credibility Findings

Regarding the discrepancies between Candelario's testimony and the troopers' testimony, the Court credited the latter. "The court, as finder of fact, is free to accept or reject any or all of a witness's testimony." United States v. Leake, Crim. No. 07-655, 2009 WL 482372, *2 (D.N.J. Feb. 25, 2009), aff'd, 396 Fed. Appx. 898 (3d Cir. 2010), cert. den'd, 131 S.Ct. 1541 (2011) (quoting United States v. Murphy, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005), in turn citing United States v. Conley, 859 F. Supp. 830, 840 (W.D. Pa. 1994) (internal quotations omitted)). Witness credibility determinations turn on

16

several factors, "including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic." Id. (internal quotations omitted). "Furthermore, 'the testimony of a witness is not to be judged more or less credible because the witness is a law enforcement officer.'" Id. (citing United States v. Bethancourt, 65 F.3d 1074, 1080 (3d Cir. 1995), cert. den'd, 516 U.S. 1153 (1996) and Conley, 859 F. Supp. at 840).

The Court found both troopers' testimony credible. (Tr. 126:13-25.) Trooper Zapata's manner on the stand was confident and relaxed, and he appeared to have a strong recollection of the night in question. His testimony was corroborated by Trooper Kennedy. Further, the large size of the gun – which measured 21 inches in length (Ex. D-3) – tended to corroborate his representation that he could make out the outline of a shotgun in Defendant's pants. (Tr. 131:6-9.) In fact, Zapata's demonstration revealed to the Court that when the gun was placed under his pants, the outline of the gun was indeed visible.

After assessing Candelario's manner on the stand and considering his interest in helping his cousin, the Court found him not credible

when he testified that the officers searched the Defendant last and retrieved the firearm from him at that time.  In assessing credibility, the Court must consider "the consistency of a witness's testimony with that of other witnesses."  <u>Murphy</u>, 402 F. Supp. 2d at 571.  Zapata and Kennedy both testified that Zapata stopped and frisked Defendant immediately upon arriving on the scene and, at that time, discovered the shotgun.  Accepting Candelario's version of events would have essentially required the Court to reject the troopers' narrative as to why Defendant caught their attention and why Zapata stopped and frisked him.  The Court was particularly unwilling to do this in light of the troopers' credible and consistent testimony and the fact that Candelario was not present at the time Defendant was seized.  Accordingly, the Court credited the troopers' recollection and rejected Candelario's inconsistent testimony.[5]

With respect to Candelario's testimony regarding Defendant's demeanor, the Court noted that it was not inconsistent with the troopers' testimony, given the passage of time between when

---

[5] The Court held at the June 20th hearing:
> Mr. Candelario has testified that Mr. Carson was the last one searched on the ground; that there were four and he was the fourth one that was searched on the ground. That testimony I do not find to be credible. It certainly does not comport with any of the testimony that this Court has heard and seen and has found to be credible by the Troopers and it simply is testimony that really makes little sense that having found that the Troopers were concerned and stopped the defendant because they believed he had a firearm. It belies the notion that having found that testimony to be credible, that Mr. Carson would be the last one that they would search.

(Tr. 131:10-20.)

Candelario observed Defendant and when the troopers observed him. While the exact chronology of events is unclear from the record, Candelario was gone from the scene at Baring Street for at least five minutes and missed the troopers' seizure of Defendant. (Tr. 99:12-15.) Both troopers testified that they were only observing Defendant for approximately five to ten minutes before approaching him. (Tr. 24:18-22, 69:23-24.) Thus, it is quite plausible that, consistent with Candelario's testimony, Defendant was not tugging at his waistband, dragging his left leg, or looking up and down the street <u>while Candelario was present</u>, but he did do so <u>after Calendario left</u>, which would be consistent with the troopers' observations of him. This chronology makes sense of the testimony.

### 5. The Court's Ruling

Following the hearing, the Court issued its ruling from the bench. The Court analyzed this case under the framework set forth in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), <u>see</u> <u>supra</u>, and concluded that, in light of all the circumstances, the stop and frisk was reasonable. In the interest of making a clear and thorough record, the Court reiterates the relevant facts upon which it relied in issuing its ruling.

First, the <u>Terry</u> stop occurred at 11 o'clock at night in what both parties agree is a high-crime area. The troopers' investigation in this neighborhood was part of a response to complaints of drug sales and people brandishing weapons. <u>See</u>, <u>supra</u>, Part III.A. Only one

or two months prior, Zapata had retrieved weapons from two individuals in this area. (Tr. 19:1-7.) "While an individual's presence in a high-crime area is not by itself sufficient to warrant a <u>Terry</u> stop . . . the fact that the stop occurred in a high crime area is among the relevant contextual considerations in a <u>Terry</u> analysis." <u>United States v. Valentine</u>, 232 F.3d 350, 356 (3d Cir. 2000), <u>cert. den'd</u>, 532 U.S. 1014 (2001) (citing <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000)) (internal quotations and brackets omitted).

Second, Defendant was acting in a suspicious manner, repeatedly tugging at the left side of his waistband, looking up and down the street, and dragging his left leg. <u>Cf.</u> <u>Spears v. Leporace</u>, 449 Fed. Appx. 187, 190 (3d Cir. 2011) (reasonable suspicion existed where police officer observed suspect adjust something in waistband, then quickly put left hand in jacket pocket, and act nervously upon questioning). Defendant's conduct suggested to Trooper Zapata, based on his training and experience, that Defendant was carrying a concealed firearm. The Court credited this assessment given Zapata's credible testimony, nine and a half years of investigative experience, and familiarity with firearm offenses, having made 20 to 25 such arrests in the Camden area prior to this one, (<u>see</u> Tr. 131:21-23). <u>See</u> <u>United States v. Lopez</u>, 441 Fed. Appx. 910, 913 (3d Cir. 2011), <u>cert. den'd</u>, -- S.Ct. --, 2012 WL 645892 (2012) ("In determining the legality of a <u>Terry</u> stop, we consider the totality of the circumstances . . . and, in so doing, give considerable

deference to police officers' determinations of reasonable suspicion.").

Third, upon his approach, Zapata observed Defendant blade his body, revealing the outline of what appeared to be a gun underneath his pants.  Courts have held that where a police officer observes the outline of a gun or an unusual bulge in an individual's pants, that fact contributes to a finding of reasonable suspicion.  See, e.g., United States v. Holyfield, 282 Fed. Appx. 129, 131 (3d Cir. 2008), cert. den'd, 555 U.S. 978 (2008) ("Although 'bulges' themselves in someone's pants may not create reasonable suspicion, that fact may be considered in conjunction with other factors when viewing the totality of the circumstances."); United States v. Samuels, 131 Fed. Appx. 859, 863 (3d Cir. 2005) (police had reasonable suspicion sufficient to justify Terry stop from anonymous tip, high crime area, visible bulge in defendant's waistband and defendant's conduct, i.e., gestures toward waistband after police demanded that he raise his hands); United States v. Wright, 31 Fed. Appx. 211, 212-213 (4th Cir. 2002) (reasonable suspicion existed where suspect was in high-crime area with irregular bulge in shorts pocket, he immediately began walking away from officers after noticing them, and one officer saw outline of gun in his pocket); see also United States v. Pope, 212 Fed. Appx. 214, 217 (4th Cir. 2007) (noting in dicta that officers' observation of the outline of a gun concealed beneath defendant's clothing "would certainly have created a particularized and objective

basis for an investigative detention").

Fourth, Defendant attempted to walk away from the troopers when they approached him and announced their presence.  (Tr. 124-132.) Such evasive movements must be considered in determining whether reasonable suspicion existed. Valentine, 232 F.3d at 357 (holding that in evaluating totality of circumstances, court must take into account fact that defendant immediately began walking away from patrol car when it arrived).

Given the totality of these circumstances, the Court concluded that Trooper Zapata had reasonable suspicion to believe Defendant was engaged in criminal activity and could be armed and dangerous.

### B.    Evidentiary Hearing on August 19, 2011

Subsequently, the government brought out a discrepancy in the record; namely, that Trooper Zapata had testified at the June 20th hearing that he did not have binoculars while observing Defendant prior to the stop and frisk, but the government's opposition brief to the motion to suppress represented that he did have binoculars. (Hearing Transcript, Aug. 19, 2011, 6:7-19, Dkt. Ent. 41 ("Aug. 19th Tr.").)  The Court conducted a hearing on this matter on August 19, 2011.  At this hearing, Zapata testified again that he did not have binoculars while observing Defendant.  (Aug 19th Tr. 24:13-24.)  He also testified that he never indicated to the federal prosecutor on this case that he did have binoculars.  (Id.)  The Assistant United States Attorney suggested that the discrepancy was likely due to an

error he had made in his notes, in which he had written "watching through binoculars." (Aug. 19th Tr. 28:1-16.)

Zapata has consistently and credibly testified that he did <u>not</u> use binoculars while observing Defendant. He also credibly denied ever telling the Assistant United States Attorney anything to the contrary. Accordingly, the Court rejects Defendant's contention that the notation in the government attorney's notes should serve as a basis for overturning its prior decision on the motion to suppress.

### C. Evidentiary Hearing on March 8, 2012

On March 8, 2012, the Court held a third evidentiary hearing, in which Defendant was permitted an opportunity to cross-examine Trooper Kennedy with respect to the <u>Giglio</u> material, which was disclosed subsequent to the June 20th hearing.

Trooper Kennedy testified that in December 2003, he received a performance notice for filing an inaccurate report. (Ex. D-6.) He described a traffic stop, which he conducted in June 2003, which gave rise to this performance notice. (Hearing Transcript, Mar. 8, 2012, 19:5-16, Dkt. Ent. 44 ("Mar. 8th Tr.").) According to Kennedy, he had received a dispatch from the Burlington Township police department concerning a shoplifting complaint at the Burlington Center Mall. The dispatch gave the description of the vehicle and the occupants and advised that the suspects were traveling southbound on Interstate 295. (Mar. 8th Tr. 19-20.) Kennedy testified that he saw the vehicle in question and pulled it over. After observing the

occupants, noting their suspicious behavior, and seeing bags of clothing in the back of the vehicle, which matched the description on the dispatch, Kennedy conferred with his supervisor. (Id. at 20-21.) Kennedy testified that his supervisor initially advised him to obtain consent to search from the suspects, which Kennedy did. (Id. at 21:8-10, 31:5-20.) Later, however, his supervisor advised that Kennedy had enough probable cause to search the vehicle even without consent. (Id. at 21:24-22:6.) Kennedy testified that after arresting the suspects, he therefore did not include the consent-to-search form in his case report, believing that consent had not been necessary. (Id. at 21-22.) Kennedy testified that due to his failure to include this form in his report, he received a performance notice for filing an inaccurate report. (Id. at 28:10-14.)

On cross-examination, Trooper Kennedy conceded that he had failed to mention this performance notice to the government during preparation sessions prior to the June 20th evidentiary hearing, on May 19 and June 16, 2011. (Id. at 7:15-8:15.) Kennedy testified that when asked at both prep sessions whether there were any instances in his professional or personal life that would reflect poorly on his credibility or honesty, including any Internal Affairs complaints, which were substantiated, he answered no. (Id. at 7:21-8:15.) Kennedy explained that it did not occur to him to report the 2003 incident, because it resulted in "just a performance notice", which

officers receive for minor infractions on numerous occasions throughout their careers.  (Id. at 14:22-15:2.)  Kennedy testified that he believed the federal prosecutor was concerned about more serious infractions, such as an "official misconduct", which can lead to termination or suspension.  (Id. at 14:16-15:2; 23-24.)  According to Kennedy, infractions that constitute official misconduct are usually "off duty incidents, [such as] drinking and driving, getting locked up for domestic violence, [and other] serious-in-nature cases."  (Id. at 23:13-18.)  Kennedy testified that performance notices, on the other hand, are issued for minor infractions, such as failing to check the audio system in the police car before making a traffic stop, taking passengers or drivers out of a vehicle and putting them in between the police car and the suspect's car, or failing to indicate the race or gender of a person after making a traffic stop.  (Id. at 24:16-25:8.)  Unlike official misconduct, the only types of discipline that performance notices result in are more training and review of standard operating procedures for the particular incident at issue.  (Id. at 25:17-21.)

The Court finds Trooper Kennedy's testimony credible.  His testimony indicated that his failure to file the consent-to-search form was an innocent and reasonable mistake, as was his failure to mention the performance notice to the Assistant United States Attorney.  He had received the performance notice more than seven years prior to the prep sessions, and it did not result in an adverse

employment action, such as suspension or termination.  Further, it
is arguable whether Kennedy's failure to file a form in reliance on
his supervisor's advice has any bearing on his credibility or honesty,
and it is thus unclear that Kennedy was even obligated to report it
to the Assistant United States Attorney.  Accordingly, the Court
finds that Kennedy's failure to file the consent-to-search form and
his failure to mention the performance notice during prep sessions
with the government do not impugn his credibility, and the Court's
previous findings at the June 20th hearing still stand.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is
again denied.  An appropriate Order will issue herewith.


Date: <u>April 18, 2012</u>                    <u>s/Renée Marie Bumb</u>
                                       RENEE MARIE BUMB
                                       United States District Judge